### GARITA HOTEL LTD. PARTNERSHIP d/b/a Garita Hotel Corporation, Plaintiffs,

### v.

### PONCE FEDERAL BANK, F.S.B., Defendants.

### Civil No. 90–1425(DRD).

United States District Court, D. Puerto Rico.

Sept. 23, 1996.

Eric A. Tulla, Rivera, Tulla & Ferrer, Hato Rey, PR, Frank G. Salpietro, Meyer, Unkovic & Scott, Pittsburgh, PA, Jose R. Franco–Rivera, Hato Rey, PR, for Garita Hotel Ltd. Partnership.

Jorge Segurola, Goldman, Antonetti & Cordova, San Juan, PR, for Ponce Federal Bank.

### OPINION AND ORDER

DOMINGUEZ, District Judge.

Plaintiff, Garita Hotel Limited Partnership ("Garita"), filed the instant complaint on March 23, 1990, against Ponce Federal Bank, F.S.B. ("Ponce Federal") and the Government Development Bank of Puerto Rico ("GDB"), alleging that the defendants breached their contractual obligation to grant Garita a loan for the reconstruction and operation of a hotel in Carolina, Puerto Rico. Ponce Federal now moves for dismissal of the complaint or for reconsideration of the earlier denial of its motion for summary judgment. For the reasons discussed below, the Court grants Ponce Federal's motion for reconsideration.

## I. Facts not in Controversy

### A. The Loan Agreement

In November, 1985, Garita purchased the leasehold rights of the former Isla Verde Holiday Inn in Carolina, Puerto Rico. The hotel did not have a casino and had been closed for over a year. Garita wanted to rebuild the hotel as a "luxury world class restaurant, hotel, and casino facility," and reopen it for the 1986 winter tourist season. In January, 1986, Garita first applied to the Government Development Bank of Puerto Rico ("GDB") for a sixteen million dollar ($16,000,000) permanent loan, with a twenty-five year term, which it needed to refurbish, remodel, expand, and reopen a hotel with a

casino.[1] Garita stated that it had already made a four million ($4,000,000) equity investment in the property. Garita projected "that the hotel will have an annual average income before fixed charges of approximately THREE MILLION FIVE HUNDRED THOUSAND DOLLARS ($3,500,000.00)." To support its forecast of revenues, expenses, and cash flow, Garita submitted a feasibility study prepared by Laventhol & Horwath, an accounting firm, that indicated that approximately thirty per cent (29.6%) of the hotel's operating revenues would come from the casino operations.

GDB considered and rejected Garita's proposed terms for the loan. However, GDB was willing to consider issuing a loan if the terms of the loan were structured differently. First, GDB stated that only an eight million dollar ($8,000,000) permanent loan would be considered, to be repaid over a twenty year period (instead of the twenty-five year period requested by Garita). Second, GDB requested that Garita obtain full interim financing from a commercial bank, as well as the participation of a commercial bank in the permanent loan.[2] Finally, GDB indicated that a working capital loan would not be approved.

Garita then applied to Ponce Federal for a six million dollar ($6,000,000) permanent loan to complete the permanent financing, as well as $14 million in interim financing. Shortly after receiving Garita's application, Ponce Federal communicated to GDB its interest in the interim financing of the project and in the $6 million permanent loan. Ponce Federal advised GDB that its participation in the proposed permanent financing was subject to approval by Ponce Federal's Board of Directors.

On April 29, 1986, GDB issued a commitment letter containing the terms and conditions of GDB's $8 million permanent loan to Garita. In particular, the commitment letter required Garita to obtain from a participating bank a $6 million permanent loan, to run *in pari passu* with GDB's lead $8 million permanent loan, so as to complete the permanent financing of $14 million.[3] GDB's commitment letter also identified Ponce Federal as a possible source of the supplemental $6 million permanent loan, but did not require that Ponce Federal be the actual lending institution for that $6 million loan.[4] Furthermore, the commitment letter required at par. 7 that "[p]rior to the closing date of the Loan acceptable evidence shall be submitted to GDB to the effect that: .... (h). [h]as been obtained a franchise of a hotel chain acceptable to GDB and/or a management contract has been signed between the Applicant and a person or firm acceptable to this Bank for the operation of the hotel and *casino....* In the event that all the evidence requested in Paragraph 7–a to 7–h hereinbefore is not submitted, GDB's commitment to grant the Loan will be without effect immediately." (Emphasis added).

On July 31, 1986, Garita submitted an application for a casino license to the Commissioner of Financial Institutions. Garita informed the Commissioner that it intended to operate a world class restaurant, hotel, and casino facility, and that a casino license was needed to close the proposed financing of the project. Garita also informed the Commissioner that both GDB and Ponce Federal would participate in the proposed financing and that both banks had required Garita to exhibit a casino license to substantiate the feasibility of the hotel operation.[5]

1. Garita stated it needed approximately one million three hundred thousand dollars ($1,300,000.00) to cover its purchase money obligation, and fourteen million seven hundred thousand dollars ($14,700,000.00) for all other costs.

2. The interim financing would be used for the reconstruction of the hotel. The interim loan would be replaced with a permanent loan as soon as the construction project was completed.

3. *In pari passu* means "in equal step." In other words, the loans would have the same priority.

4. The commitment letter stated, at par. 6, that "[t]he $6,000,000 loan to be granted to the Applicant by the Ponce Federal Bank or any other lending institution shall be disbursed previously or simultaneously with the Loan."

5. Garita's application to the Commissioner, signed by Mr. Jorge Fuentes Dávila, Vice President of the Garita Hotel Corporation and General Partner of the Garita Hotel Limited Partnership, stated that "[t]hese banks [GDB *and Ponce Federal*] have requested from us *prior to closing of our loan exhibition of a Casino License issued in our name,* as promptly as of this date, to

On September 16, 1986, Ponce Federal's Executive Vice President, Mr. Henry L. Borda, presented to the Board of Directors Garita's request for an interim financing of $14 million and a permanent financing of the same amount, of which Ponce Federal was being asked to finance $6 million. The presentation covered GDB's commitment letter for an $8 million permanent loan. The presentation also covered a proposed agreement with GDB wherein Ponce Federal was to purchase GDB's $8 million permanent loan to Garita, subject to GDB's agreement to repurchase the outstanding balance of this loan from Ponce Federal at the end of a ten year period, or earlier if Garita defaulted. Ponce Federal would pay GDB an annual fee of 1% in return for GDB carrying the risk that Garita would default on the loan during the ten year period of the repurchase agreement. Finally, the Board considered a proposal to GDB to set a fixed interest rate during the first ten years of the permanent financing.

The Board of Directors expressed interest in the loan, but decided to delegate the case to the Executive Committee because the person in Ponce Federal who had the Laventhol & Horwath feasibility study could not be present at the meeting. Ponce Federal's Executive Committee met on September 18, 1986, to consider Garita's case. The Committee focused on the Laventhol & Horwath feasibility study, reviewed GDB's commitment letter for an $8 million permanent loan, and took into consideration the fact that a casino license would be required. The Executive Committee then internally approved a $14 million interim loan, as well as a $6 million permanent loan to run *in pari passu* with GDB's $8 million permanent loan. The Committee at the same time approved a repurchase agreement with GDB.

On September 29, 1986, Eugenio Otero Silva, acting as Notary Public designated by Ponce Federal, prepared a draft of the proposed Loan Agreement, and a second draft on October 10, 1986. According to the draft Loan Agreement, Ponce Federal was to provide Garita with $14 million in interim financing, which amount would be replaced with $14 million in permanent financing, GDB providing an $8 million permanent loan, and Ponce Federal providing a $6 million permanent loan, to run *in pari passu* with GDB's loan. The draft also reflected that the conversion of the interim financing into permanent loans would take effect by the issuance of two promissory notes, one in the principal amount of $8 million payable to GDB, and another in the principal amount of $6 million payable to Ponce Federal. The draft further contained Garita's representations to both GDB and Ponce Federal regarding Garita's full compliance with the terms and conditions of its casino license.

On October 21, 1986, Ponce Federal's Board of Directors met and internally ratified the action taken by the Executive Committee concerning Garita, but with some reservations. Ponce Federal did not issue a commitment letter to Garita. Instead, on October 22, 1986, Ponce Federal's President and Chairman of the Board of Directors, Mr. Ramiro L. Colón, sent a memorandum to Mr. Borda indicating that the Board of Directors required that Garita have, at least, a provisional license to operate a casino. Mr. Colón also instructed Mr. Borda to verify Garita's $4 million equity investment to insure that Garita had indeed made such an investment and that it remained in place.

Ponce Federal's reservations about issuing either the $14 million interim loan or the $6 million permanent loan were unresolved. In the meantime, however, on October 31, 1986, Garita and Ponce Federal signed a written Loan Agreement providing Garita with bridge financing so that it could continue with the reconstruction of the hotel. This written Loan Agreement stated that Ponce Federal "has not decided whether to commit itself and is not willing to finally consider GARITA's request unless GARITA obtains a casino license for the Project." *Loan Agreement*, at 2. Garita paid Ponce Federal eight

---

substantiate feasibility of our hotel operation.... We take this opportunity to respectfully request from you prompt attention and consideration of our Gambling Franchise Application hereunder, in order to permit us to complete our financing

plans with the closing of our loans and to commence construction work at the project site without delay during the forthcoming month of August, 1986, shortly after closing." (Emphasis added).

thousand dollars ($8,000) as a service fee for the bridge financing.[6]

## B. Problems Arise

On November 16, 1996, the Commissioner of Financial Institutions denied Garita's application for a license to operate a casino. Shortly afterwards, Garita asked GDB whether the casino license was required for the interim financing. Garita indicated to GDB that in June, 1986, Ponce Federal had advised Garita that it interpreted GDB's commitment letter as requiring such a license before the disbursement of the interim financing. On December 3, 1986, GDB notified Garita that its commitment letter of April 29, 1986, required that prior to the disbursement of the permanent loan approved by GDB, Garita submit evidence acceptable to GDB that it had a license to operate a casino and that the casino was ready for operation.

In the meantime, Ponce Federal had granted Garita four individual bridge loans, each evidenced by a separate promissory note and secured by a first mortgage on Garita's leasehold interest, for a total amount of one million dollars ($1,000,000).[7] Two of these loans had been granted before the parties entered into the Loan Agreement. The third and fourth bridge loans were granted in fulfillment of Ponce Federal's obligations under the October 31, 1986, Loan Agreement. The third loan was granted on the date of the Loan Agreement, and the Fourth was granted after the Commissioner of Financial Institutions had denied Garita's application for a casino license, but before Garita's motion for reconsideration had been decided.

The Commissioner of Financial Institutions denied Garita's motion for reconsideration on December 19, 1986. Garita appealed

to the Superior Court of Puerto Rico, San Juan Part, but the Court confirmed the denial of the casino license.

On February 4, 1987, Ponce Federal demanded that Garita repay the bridge loans for failure to comply with the Loan Agreement's requirements. Without a license to operate a casino, Garita could not meet the casino license requirement, as explained by GDB in its letter to Garita. Garita then met with Ponce Federal and agreed to make an initial payment of two hundred fifty thousand dollars ($250,000) and a second payment of seven hundred fifty thousand dollars ($750,-000) by June 9, 1987. On June 11, 1987, Garita made the second and final payment on the bridge loans.

In May, 1987, with one of its sources of financing having dried up, Garita requested GDB to extend its commitment and allow Garita to proceed without a casino. Garita explained that Ponce Federal had taken the position that it could not proceed with the financing unless the casino license was in place. GDB took the matter under consideration, and requested the opinion of the Puerto Rico Tourism Company. The Tourism Company decided not to recommend the proposal for a hotel without a casino, because the income projections presented by Garita were based on unrealistic projections of room occupancy. Considering this response, GDB informed Garita that it could not continue with the evaluation of its loan application.

## C. Filing of the Action and Subsequent Proceedings

Garita filed this complaint against Ponce Federal and GDB on March 23, 1990, alleging that:

Notwithstanding the fact that plaintiff complied with all the conditions and requirements of the April 29, 1986, commit-

---

**6.** Garita originally alleged in its complaint that it had paid Ponce Federal eight hundred thousand dollars ($800,000) as a commitment fee. However, Ponce Federal has presented uncontroverted evidence that commitment fee was paid to GDB, not to Ponce Federal, and that the amount paid was only eighty thousand dollars ($80,000).

**7.** The bridge loans did not form part of the interim nor of the permanent financing. In-

stead, they were intended to permit Garita to initiate construction as early as possible, ideally by the 1986–87 tourist season. However, as testified to by an expert witness retained by Garita, Mr. Julio Rivera, at a deposition held on December 1, 1992, these four bridge loans were individually mortgaged to protect the issuer in case the principal loan was not approved.

ment letter, Ponce Federal never lived up to its committed obligations and never approved nor disbursed the loan. Plaintiff, relying on the defendant's assertion that the loan approval was short [sic] forthcoming, initiated ground work at the project and invested nearly $1,200,000.00. This amount was advanced by Ponce Federal by way of so-called 'bridge loans,' which were supposed to be repaid pursuant to the principal loan financing provisos. This was not to be and Ponce Federal demanded as of June 9, 1987, the repayment of the amounts due under the 'bridge loans,' plaintiff repaid the demanded amounts to avoid further embarrassment and humiliation.

*Amended Complaint,* pars. 9–13. Garita argued that Ponce Federal's refusal to issue the permanent loan "constitute[d] a clear and unequivocal breach of contract."

The complaint went on to state that Garita had suffered various types of consequential damages: seventy million dollars ($70,000,000) in lost profits from the operation of the hotel over a ten year period; one hundred million dollars ($100,000,000) in "irreparable damage to its credit rating and business reputation by having to repay, in an untimely fashion, the amounts owed under the 'bridge loans;'" one million dollars ($1,000,000) in accrued interest on the initial purchase of the leasehold; one hundred thousand dollars ($100,000) for the specific expenses incurred by Garita's officers during its efforts to obtain a loan; and eight hundred thousand dollars ($800,000) that Garita had paid Ponce Federal as a commitment fee. The complaint was later amended, but neither in the original nor in the amended complaint was the October 31, 1986, written Loan Agreement ever mentioned. Instead, Garita consistently alleged that Ponce Federal had agreed to issue the loan subject to the terms of GDB's commitment letter.

Various proceedings ensued. Ponce Federal filed a motion to dismiss under Fed. R.Civ.P. 12(b)(6), arguing that it was GDB, not Ponce Federal, that issued the loan commitment, and, in the alternative, that Garita had failed to comply with a condition precedent to the issuance of the loan (namely, obtaining a casino license). The Court entered judgment of dismissal for Ponce Federal on the basis that Ponce Federal was not a party to the contract allegedly breached. The Court also chose to decline the exercise of supplemental jurisdiction over Garita's state law contract claims against GDB, and thereby entered judgment dismissing those claims without prejudice. However, the Court did not rule on Ponce Federal's alternate argument for dismissal. Garita moved for reconsideration, but the Court denied the motion via a margin order.

On appeal from the Court's judgment, Garita argued that the allegations contained in the complaint sufficed to state a claim for breach of contract. Ponce Federal, although admitting that the documents submitted by Garita satisfactorily evidenced its approval of the loan and assumption of GDB's commitment letter, nevertheless urged affirmance of the District Court's judgment on any one of three alternate grounds. First, Ponce Federal suggested that when the District Court had denied the motion for reconsideration, it had quietly shifted the grounds for its holding. Second, Ponce Federal claimed that because its motion to dismiss was supplemented with documentary evidence, it automatically became a motion for summary judgment. Third, and finally, Ponce Federal submitted again the argument that Garita had not complied with the condition precedent of obtaining a casino license.

The Court of Appeals agreed with Garita, vacating the District Court's judgment and remanding the case for further proceedings. *Garita Hotel Ltd. v. Ponce Federal Bank,* 958 F.2d 15 (1st Cir.1992). The laconic character of the margin order whereby the District Court denied the motion for reconsideration made it impossible to verify that the Court had considered Ponce Federal's "condition precedent" argument. Moreover, the Court of Appeals held that the motion before the District Court clearly should be considered to be a motion to dismiss, rather than a motion for summary judgment, both because the Court had made no reference to the documentary evidence submitted by Ponce Federal, and because the Court "had phrased its decision entirely in the idiom of Rule

12(b)(6)." *Garita Hotel*, 958 F.2d at 19. Finally, the Court of Appeals declined to affirm on the alternate ground proposed by Ponce Federal, even though it had discretionary authority to do so. The Court of Appeals was concerned that the record was not "entirely clear as to the scope of the condition precedent upon which P–Bank" relied. *Id.* In addition, the Court thought that "Garita was entitled to further discovery before confronting a straight Rule 56 motion addressed to the 'condition precedent' ground." *Id.*

On remand, Garita voluntarily dismissed, with prejudice, its claims against co-defendant GDB. Subsequently, after both parties had an opportunity to pursue discovery, Ponce Federal filed a motion for summary judgment, which was denied by the Court on September 21, 1994 (Docket No. 126). On October 27, 1994, this case was reassigned to the undersigned.

Throughout this entire process, Garita had complied with the Court's discovery orders with less than alacrity. The Court granted Garita a final extension to comply with Ponce Federal's discovery requests by January 18, 1995. On that date, Garita delivered a box containing three thousand documents, among which Ponce Federal found one which utterly changed the parties' arguments. Nearly five years into this litigation, Ponce Federal found a copy of the written Loan Agreement that the parties had entered into on October 31, 1986.

Faced with the written Loan Agreement, Garita changed tack, finally admitting that the Agreement required Garita to obtain a casino license as a condition precedent to the disbursement of the loan. However, Garita also for the first time in this litigation raised the issue of duress. Garita now claimed that the Loan Agreement was invalid because its representatives had agreed to the casino license condition only under duress.

Specifically, Garita claims that at a meeting in September, 1987, Ponce Federal had verbally agreed to grant by itself the total interim and permanent financing of fourteen million dollars ($14,000,000) without conditions. According to Garita, Ponce Federal insisted that the written Loan Agreement contain a clause requiring Garita to obtain a casino license, and threatened to withhold all financing unless Garita agreed to the new requirement. Garita's contention is that Ponce Federal's actions constitute duress under Puerto Rico law.

Currently pending before the Court are three motions filed by Ponce Federal. The first is a motion to dismiss the plaintiff's complaint (Docket No. 111). The latter two are motions for reconsideration of the Court's earlier order denying a motion for summary judgment (Docket Nos. 129, 148). In all three motions, Ponce Federal argues that under the terms of the Loan Agreement, it was entitled to refuse to disburse the loan when it became certain that Garita had not obtained a casino license. Furthermore, Ponce Federal denies that there was a prior oral agreement or that Garita entered into the Loan Agreement under duress.[8]

On February 5, 1996, the Court referred all three motions to U.S. Magistrate Judge Justo Arenas for a report and recommendation (Docket No. 172). On March 25, 1996, the Magistrate Judge issued a report recommending that the Court reconsider its earlier decision and instead grant the motion for summary judgment (Docket No. 173). Garita timely filed an opposition to the Magistrate's recommendation (Docket No. 181), and Ponce Federal has filed a reply thereto (Docket No. 184).[9] Having reviewed *de novo* those parts of the Magistrate's recommenda-

---

8. In the alternative, Ponce Federal argues that even assuming, for the sake of argument, that Ponce Federal had elicited Garita's consent to the Loan Agreement under duress, Garita's claim of duress would nevertheless be time-barred under the four year period prescribed by Civil Code Art. 1253, codified at P.R.Laws Ann. tit. 31, § 3512. Because the Court finds that Garita was not acting under duress when it entered into the Loan Agreement, there is no need to rule upon this argument.

9. Even before Garita had filed its objection, Ponce Federal had also filed a "Response" to the report and recommendation, urging that the Court approve the Magistrate's conclusions, but requesting that certain aspects of the report be clarified and/or expanded upon (Docket No. 176).

tion that Garita objected to, the Court now approves the Magistrate's report and recommendation, for the reasons discussed below.

## II. Standard for Summary Judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "Where the defendant has invoked Rule 56 and asserted a lack of supporting evidence, the plaintiff must establish the existence of a triable issue which is both genuine and material to his claim." *Pagano v. Frank,* 983 F.2d 343, 347 (1st Cir.1993) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). "In this context, 'genuine' means that the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party [and] 'material' means that the fact is one that might affect the outcome of the suit under the governing law." *United States v. Plat 20, Lot 17,* 960 F.2d 200, 204 (1st Cir.1992).

The nonmovant must "present definite, competent evidence to rebut the motion." *Mesnick v. General Electric Co.,* 950 F.2d 816, 822 (1st Cir.1991), *cert. denied,* 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992). Thus, "[s]ummary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Medina–Muñoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990). Furthermore, although "[n]o credibility assessment may be resolved in favor of the party seeking summary judgment," *Woodman v. Haemonetics Corp.,* 51 F.3d 1087, 1091 (1st Cir. 1995) (citations omitted), a court must be aware that "[o]n issues where the nonmovant bears the ultimate burden of proof at trial, he may not defeat a motion for summary judgment by relying on evidence that is 'merely colorable' or 'not significantly probative.'" *Pagano v. Frank,* 983 F.2d at 347 (quoting *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2511).

## III. Review of a Magistrate's Report and Recommendation

A district court need not itself perform the initial evaluation of a motion for summary judgment; instead, it may refer the matter to a United States Magistrate Judge for a report and recommendation. 28 U.S.C. § 636(b)(1)(B) (1993); Fed.R.Civ.P. 72(b); Rule 503, Local Rules, District of Puerto Rico. *See Mathews v. Weber,* 423 U.S. 261, 96 S.Ct. 549, 46 L.Ed.2d 483 (1976). Of course, the plaintiff may contest the Magistrate's report and recommendation; 28 U.S.C. § 636(b)(1) (1993), in pertinent part, provides that:

> "[w]ithin ten days of being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate."

This statutory provision is echoed by Fed. R.Civ.P. 72(b) and Local Rule 510.2. In addition, Local Rule 510.2(A) states that "[a]ny objections to the Magistrate Judge's proposed findings, recommendation, or report must be filed with the Clerk of the Court within ten (10) days after being served with [a] copy thereof. *Failure to file objections within the specified time waives the right to appeal the District Court's order*" (emphasis added). Rules such as this one have been approved by the U.S. Supreme Court. *Thomas v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1980), *reh'g denied,* 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986) ("[w]e hold that a court of appeals may adopt a rule conditioning appeal, when taken from a district court judgment that adopts a magistrate's report and recommendation, upon the filing of objections with the district court identifying those issues on which further review is desired.")

Pursuant to this rule, "[a]bsent objection by the plaintiffs, the district court had a

right to assume that plaintiffs agreed to the magistrate's recommendation." *Templeman v. Chris Craft Corp.,* 770 F.2d 245, 247 (1st Cir.), *cert. denied,* 474 U.S. 1021, 106 S.Ct. 571, 88 L.Ed.2d 556 (1985). Moreover, "[f]ailure to raise objections to the Report and Recommendation waives that party's right to review in the district court and those claims not preserved by such objection are precluded on appeal." *Davet v. Maccarone,* 973 F.2d 22, 30–31 (1st Cir.1992). *See Keating v. Secretary of H.H.S.,* 848 F.2d 271, 275 (1st Cir.1988); *Borden v. Secretary of H.H.S.,* 836 F.2d 4, 6 (1st Cir.1987) ("[a]ppellant was entitled to a de novo review by the district court of the recommendations to which he objected, ..., however he was not entitled to a de novo review of an argument never raised."); *United States v. Valencia–Copete,* 792 F.2d 4, 6 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603, 605 (1st Cir.1980).

## IV. The Report and Recommendation, and Objections Thereto

As noted above, the report and recommendation submitted by Hon. Justo Arenas, U.S. Magistrate Judge, urges the Court to grant Ponce Federal's motions for reconsideration of the earlier order denying its motion for summary judgment. In general, Magistrate Arenas indicates that although "Garita contends that Ponce verbally agreed to grant the loan," "the record lacks the corroborative evidence needed to substantiate or verify this contention" because under the Commerce Code of Puerto Rico, oral "testimony by itself is insufficient to establish the existence of a commercial contract in excess of $300, unless it concurs with other non[-]testimonial evidence." *Report and Recommendation,* at 11–12.

Both parties filed responses to the report and recommendation. Ponce Federal, although generally pleased with the result, nevertheless requested that the Court modify and/or clarify some of the Magistrate Judge's findings of fact, which in some cases it found imprecise. Moreover, Ponce Federal requested that the Court consider adding to the conclusions of law various other arguments in favor of summary judgment that did not appear to have been evaluated by the Magistrate Judge, so that in the event that Garita appealed, Ponce Federal would not be found to have waived those other arguments (Docket No. 176).

Garita, on the other hand, filed a motion objecting to various findings of fact and conclusions of law contained in the report and recommendation (Docket No. 181). In general, Garita argues that:

"[t]he recommendation issued by the Magistrate Judge is improvident inasmuch as it improperly resolves issues of credibility that should be decided, pursuant to the provisions of the Seventh Amendment, by a jury; and, thus, circumvents the rule that a motion for a summary judgment should not be issued when there is a genuine issue of material fact. In this case there is a genuine issue of material fact—whether there was an oral contract between the parties—that warrants a full-fledged jury trial."

*Objections to Magistrate's Report and Recommendation,* at 1–2. Garita first points out that the burden of proof on the issue of whether the Commerce Code applies to a given contract lies on the party seeking to apply the Code. Garita then argues that because "there is no evidence in the record as to the commercial nature of the loan contract," *Objections,* at 12, the Commerce Code must be presumed, at least for summary judgment purposes, not to apply to the Loan Agreement. Consequently, Garita argues, the existence of the alleged prior oral agreement may be proven by means of oral testimony alone.

Garita forestalls a possible objection by noting that the parol evidence rule [10] "does

---

10. The parol evidence rule was formally adopted in Puerto Rico in 1979, as part of the latest revision of the Rules of Evidence. In particular, P.R.R.Evid. 69(B) reads, in pertinent part:

When in an oral or written agreement ... all the terms and conditions constituting the true

and final intention of the parties have been included, such agreement shall be deemed as complete, and therefore, there can be between the parties ... no evidence extrinsic to the contents of the same, except in the following cases:

not prohibit oral evidence of an oral agreement which has modified the terms of a prior written contract." The Court assumes that Garita's argument is that the parol evidence rule is not really applicable to this case because the rule is concerned only with oral evidence extrinsic to a particular contract, and not with oral evidence of the existence of a prior contract. Garita therefore claims that the parol evidence rule does not prohibit oral evidence of an oral agreement which antedates (and contradicts) the terms of a subsequent written contract.

In the alternative, Garita argues that even if the Commerce Code were applicable to the alleged oral agreement, there was other non-testimonial evidence that corroborated the testimony submitted by Garita as to the oral agreement's existence. In particular, Garita points to the minutes taken at the meetings of Ponce Federal's Executive Committee and Board of Directors, which included statements to the effect that "the loan was approved."

By attempting to create a genuine issue as to whether the parties had, indeed, entered into a prior oral agreement, Garita seeks to also create a genuine issue of fact as to

> (1) Where a mistake or imperfection of the agreement is put in issue by the pleadings;
> (2) Where the validity of the agreement is the fact in dispute.
> This rule does not exclude other evidence of the circumstances under which the agreement was made or to which it is related such as the situation of the subject matter of the instrument or that of the parties, or to establish illegality or fraud.
>
> P.R.Laws Ann. tit. 32 App. IV R. 69(B) (Official translation 1983).

11. "Consent is shown by the concurrence of the offer and acceptance of the thing and the cause which are to constitute the contract." Civil Code Art. 1214, codified at P.R.Laws Ann. tit. 31, § 3401 (Official translation 1990).

· However, "[c]onsent given by error, under violence, by intimidation, or deceit shall be void," thus potentially nullifying the contract. Civil Code Art. 1217, P.R.Laws Ann. tit. 31, § 3404 (Official translation 1990).

12. "All things …, which are not out of the commerce of man, may be objects of contracts." Civil Code Art. 1223, codified at P.R.Laws Ann. tit. 31, § 3421 (Official translation 1990). Furthermore, although "[t]he object of every contract must be a thing determined with regard to its *kind*," "[t]he indetermination of the *amount* shall not be an obstacle to the existence of the

whether Garita's consent to the Loan Agreement was obtained under duress. Garita has submitted evidence, in the form of Mr. George Malizia's deposition testimony, that Ponce Federal threatened to breach its obligation under the alleged oral agreement to issue a $14 million loan unless Garita agreed to the inclusion in the written Loan Agreement of new requirements, such as the casino license. Garita contends that Ponce Federal's threat constituted duress under the Puerto Rico Civil Code. The Court now reviews *de novo* Garita's objections to the Magistrate Judge's report and recommendation.

## V. Analysis of the Objections

■ Since the controversy at hand involves a complex breach of contract claim, a brief review of Puerto Rico's law of contracts is advisable. Under the Civil Code of Puerto Rico, the general rule is that "[t]here is no contract unless the following requisites exist: (1) The consent [11] of the contracting parties;" "(2) A definite object [12] which may be the subject of the contract;" and "(3) The cause [13] for the obligation which may be es-

contract, provided it may be possible to determine it without necessity of a new agreement between the contracting parties." Civil Code Art. 1225, codified at P.R.Laws Ann. tit. 31, § 3423 (Official translation 1990) (Emphasis added).

13. *Causa*, rendered as "cause" or "consideration" in the official translation to the Puerto Rico Civil Code, is defined indirectly as follows: "[i]n contracts, involving a valuable *consideration*, the prestation or promise of a thing or services by the other party is understood as a consideration for each contracting party; in remuneratory contracts, the service or benefits remunerated; and in those of pure beneficence, the mere liberality of the benefactor." Civil Code Art. 1226, codified at P.R.Laws Ann. tit. 31, § 3431 (Official translation 1990). The decision by the official translators to use the term "consideration" may mislead some readers because the Spanish legal term *causa* is not synonymous with the common law concept of *consideration*. Among other things, *causa* encompasses almost any motivation a person might have for entering into a binding agreement. There are, however, limits to what may constitute *causa*, as Civil Code Art. 1227 establishes: "[c]ontracts without consideration, or with an illicit one, have no effect whatsoever. A consideration is illicit when

tablished." Civil Code Art. 1213, codified at P.R. Laws Ann. tit. 31, § 3391 (Official translation 1990).

Contracts are normally binding regardless of the "form in which they may have been executed, provided the essential conditions required for their validity exist." Civil Code Art. 1230, codified at P.R. Laws Ann. tit. § 31, § 3451 (Official translation 1990). However, there are two exceptions to this general rule, one applicable to contracts regulated by the Civil Code, and the other applicable to contracts regulated by the Commerce Code.

■ Civil Code Art. 1232 provides that "contracts in which the amount of the consideration of one or both of the two contracting parties exceeds three hundred (300) dollars, must be reduced to writing even though it be a private contract." P.R. Laws Ann. tit. 31, § 3453 (Official translation 1990). Nevertheless, this exception is limited, because although a literal reading of Art. 1232 might lead one to conclude that oral contracts that exceed $300 are unenforceable in general, in fact Art. 1232 merely prevents such contracts from being enforced against third parties. The original parties to such an oral contract would still be bound by it. As a commentator on Puerto Rico law has stated, the contract is born with the consent of the parties, even if its effectiveness is made difficult because of the impossibility of having the same be opposable to third parties, and the difficulty of proving its existence when the same is in doubt. José R. Vélez Torres, *Course on Civil Law*, Tome 4, Vol. II, p. 86 (1990). *See* *Quiñones–Ramos v. Otero–Roque*, 89 P.R.Dec. 378, 384 (1963); *Freyre v. Blasini*, 68 P.R.Dec. 211, 218 (1948).

■ The other exception to the general rule that contracts are binding regardless of their form may be found in Article 82 of the Commerce Code, which provides that,

Commercial contracts shall be valid and shall cause obligations and causes of action whatever may be the form and language in which they are executed ... provided their

it is contrary to law and good morals." P.R.Laws Ann. tit. 31, § 3432 (Official transla-

existence is shown by any of the means provided by civil law. *However,* the testimony of witnesses shall not in itself be sufficient to prove the existence of a contract the amount of which exceeds three hundred dollars, unless such testimony concurs with other evidence.

P.R.Laws Ann. tit. 10, § 1302 (emphasis added). As the Puerto Rico Supreme Court has noted, this article is based on the legislators' distrust of testimonial evidence in commercial contracts. By requiring non-testimonial evidence of the existence of a commercial contract, this article attempts to foster security in commercial transactions by promoting the use of more formal instruments. *Vila & Hnos. Inc. v. Owens Ill. de P.R.*, 117 P.R.Dec. 825, 833 (1986). By its terms, Art. 82 applies only to commercial contracts, which are defined and discussed below. *See* discussion *infra* part V.B.1. Note that Commerce Code Art. 82, unlike Civil Code Art. 1232, has some teeth; failure to comply with its requirements may render the contract unenforceable not only as to third parties, but also as to the original parties to the contract. This distinction between the Art. 82 and Art. 1232 turns out to be crucial to the resolution of this case, as will be further discussed below. *See* discussions *infra* part V.B.1.

In addition to the general rules on contract formation discussed above, the Civil Code specifies at Art. 1631 the requirements for a simple loan contract: "[b]y the contract of loan, one of the parties delivers to the other, ... money or any other perishable thing, under the condition to return an equal amount of the same kind and quality.... A simple loan may be gratuitous, or made under a stipulation to pay interest." P.R.Laws Ann. tit. 31, § 4511; *see also* §§ 4571–75.

There is no question that the written Loan Agreement was, from all outward appearances, a valid loan contract. This Agreement explicitly required Garita to obtain a casino license before Ponce Federal would proceed with the loan. Therefore, to defeat the motion for summary judgment, Garita was re-

tion 1990).

quired to establish that there was a genuine issue of fact as to whether the Loan Agreement was, in fact, valid and enforceable. Garita attempted to do this by seeking to establish a genuine issue as to whether Garita validly consented to the Loan Agreement.

## A. Duress

■ As noted above, Garita now claims to have signed the agreement under duress.[14] The Spanish term for duress is "intimidación," which is one of the four "vices of consent;" the other three are error, violence, and deceit. Civil Code Art. 1217. The existence of one of these "vices of consent" does not, however, automatically nullify a contract. Such a contract is considered voidable; that is, it remains valid unless and until the aggrieved party seeks its annulment. P.R.Laws Ann. tit. 31, § 3511 ("Contracts containing the requisites mentioned in Section 3391 of this title may be annulled ... whenever they contain any of the defects which invalidate them according to law.") *See Santiago–Marrero v. Superior Court*, 89 P.R.Dec. 835, 839 (1964) (a voidable contract is legally effective until it is decreed to be null). *See generally* P.R.Laws Ann. tit. 31, §§ 3511–25. Because the action for nullity is an independent cause of action, the burden of proof is on the party alleging that the contract is null because of the existence of any of the vices of consent. *See generally* P.R.Laws Ann. tit. 31, §§ 3511–12; *Millán v. Caribe Motors Corp.*, 83 P.R.R. 474, 484–85 (1961).

Intimidation is deemed to exist "when one of the contracting parties is inspired with a reasonable and well-grounded fear of suffering an imminent and serious injury to his person and property, or to the person or property of the spouse, descendants, or ascendants." Civil Code Art. 1219, codified at P.R.Laws Ann. tit. 31, § 3406. One commentator has derived five distinct requirements for establishing intimidation:

(a) A state of apprehension that compels consent.

(b) The apprehension is provoked by the actions of another person.

(c) The apprehension must be rational [or reasonable] and well-grounded.

(d) [The apprehension] refers to an injury that the subject will suffer unless he or she enters into the contract.

(e) The intimidatory actions must be anti-juridical.

M. Albaladejo, *Comentarios al Código Civil y Compilaciones Forales* [*Commentaries on the Civil Code and Foral Compilations* ] Tome 17, Vol. 1–B, p. 348 (Editorial Revista de Derecho Privado 1993) (hereinafter M. Albaladejo, *Commentaries on the Civil Code* ).

In the case at hand, viewing the facts in the light most favorable to the nonmoving party, the first requirement is clearly met. Garita has submitted the testimony of Mr. Malizia, given at a deposition, in which he states, in effect, that Garita felt compelled to sign the Loan Agreement because Garita feared that Ponce Federal would breach the oral agreement if Garita did not sign it.

■ Matters are not so clear as to the second requirement. Normally, the requirement that the apprehension be provoked by another's actions is clearly met when the alleged intimidator's actions are malicious; that is, when they are intended to intimidate. However, there is some debate between commentators as to whether there is intimidation when the actions or conduct that provoke apprehension are not malicious, but are instead imprudent [or negligent], because the alleged intimidator could or should have foreseen that he or she was provoking apprehension. Finally, it is clear that when there is no indication that the alleged intimidator acted maliciously nor negligently, there can be no intimidation. *See generally*, M. Albaladejo, *Commentaries on the Civil Code*, Tome XVII, Vol. 1–B, pp. 350–52. To determine whether this requirement has been complied with requires that a court consider the alleged intimidator's state of mind. Determinations of intent are not usually amenable to summary disposition. *Lipsett v. University of Puerto Rico*, 864 F.2d 881, 895 (1st Cir. 1988). Therefore, for purposes of summary

---

**14.** Garita submitted this argument for the first time in early 1995, nearly five years after filing this complaint and nearly nine years since the events in question.

judgment, the Court will assume that Garita has satisfied this requirement.

■ As to the third requirement cited above, to determine whether the apprehension was reasonable and well-grounded, the following factors should be considered:

(a) The means employed to communicate the threat.

(b) The character of the threat. It must have sufficient concreteness and gravity to provoke a state of apprehension.

(c) The probability that, from the victim's point of view, there be a purpose to threaten.

(d) The means with which the alleged intimidator could carry out his or her threat.

(e) The means with which the victim could avoid the consequences threatened by the alleged intimidator.

*See* M. Albaladejo, *Commentaries on the Civil Code,* Tome XVII, Vol. 1–B, at 352–53. Again viewing the facts in the light most favorable to the nonmoving party, the Court easily concludes that both the third and fourth requirements are met in the case at hand. According to Garita's version of the facts, Ponce Federal made it clear in no uncertain terms that if Garita did not agree to the terms of the Loan Agreement, Ponce Federal would breach the oral agreement by refusing to issue the $14 million loan. It follows that Garita would have had a reasonable and well-grounded fear that Ponce Federal would do what it threatened to do.

■ The fifth and final requirement constitutes the critical issue in this case. As stated above, for the actions to be intimidatory, they must be antijuridical, which includes illicit acts. Given that a contract has the force of law between the parties to it, Civil Code Art. 1044, codified at P.R.Laws Ann. tit. 31, § 2994 (Official translation 1990), the argument could be made that to threaten to breach a valid contract might constitute an illicit act for purposes of intimidation. According to this view of the law, apparently the one espoused by Garita, the threat to breach a contract could be intimidatory under certain circumstances, such as when the threatened party has little time or opportunity to seek relief in court for breach of contract.

The Supreme Court of Puerto Rico has never addressed this particular issue. Instead, Garita relies heavily on two federal court decisions, *Dopp v. HTP Corp.,* 755 F.Supp. 491 (D.P.R.1991), *aff'd in part and remanded as to damages,* 947 F.2d 506 (1st Cir.1991), referring to these as "the premier case[s] in Puerto Rico with respect to issues of duress and deceit." *Plaintiff's Supplemental Brief* at 4. In that case, the plaintiff and defendant met for several days, from November 30 to December 3, 1984, to review, negotiate, and finalize a written contract relating to the sale of a hotel, a transaction valued at close to ninety million dollars ($90,-000,000.00). At trial, the plaintiff contended that he entered into the written contract on December 3, 1984, "under duress and deceit, and that the terms of the written [contract] ... breached an oral contract he had previously entered into with [the defendant] [three days earlier] on November 30, 1984." *Dopp,* 755 F.Supp. at 493. The jury found that "the plaintiff entered into [the written contract] due to deceit or duress. It further concluded that an oral agreement existed between [the defendant] and the plaintiff on November 30, 1984, and that the oral contract had been breached." *Id.* Curiously, the District Court's opinion in *Dopp* did not expressly draw a causal relationship between the threat to breach the oral contract and the duress. However, given that the opinion provides no other facts from which duress could be inferred, this Court must conclude that in *Dopp,* the jury found that the threat to breach did constitute duress.

Nevertheless, the *Dopp* cases provide less guidance than Garita supposes. First, although the District Court opinion gives a general overview of the concept of duress in Puerto Rico law, the opinion does not explain why the jury found that Mr. Dopp had been intimidated or had acted under duress. Instead, the opinion merely related the jury's findings, quoted above. Moreover, the opinion did not mention Commerce Code Art. 82, which provides that oral testimony is not sufficient to prove the existence of a commercial contract, even though the case revolved

around the negotiations for the purchase of a ninety million dollar luxury hotel. Perhaps the oral contract was proven to exist with the aid of corroborating non-testimonial evidence, or perhaps not; it is impossible to tell from the District Court's opinion.

Second, the decision of the Court of Appeals does not constitute binding precedent on the issue of duress. Instead, the Court of Appeals merely "took as immutable fact that . . . Dopp signed the SSA under the influence of deceit or duress" only because "the weight and sufficiency of the liability evidence" was not properly before the Court of Appeals because the defendants did not file a motion under Fed.R.Civ.P. 59 for a judgment not withstanding the verdict. *Dopp v. HTP Corp.*, 947 F.2d at 511. Therefore, given that the Court of Appeals never decided the issue, and that the District Court's reasoning is too opaque to provide useful guidance, this Court must reach its own conclusions as to the interaction between the Civil Code's provisions on duress and the Commerce Code's requirements for the formalization of commercial contracts. In sum, neither opinion in the *Dopp* case is controlling.

For reasons discussed below at part V.B.2, the Court finds that Garita failed to create a genuine issue of fact as to the existence of the alleged oral loan agreement. The Court notes, however, that if Garita had successfully created such an issue of fact, then the Court would have had to squarely face the question whether a threat to breach one contract can constitute duress and thus invalidate a second contract. In that situation, the Court would have seriously considered certifying the question to the Supreme Court of Puerto Rico. *See infra* n. 15.

Nevertheless, for purposes of this order only, the Court will proceed on the assumption that the answer to this otherwise certifiable question would be affirmative. Given this assumption, the issue whether or not Garita was compelled to enter into the loan agreement under duress is certainly material, since the validity of Garita's consent would be in question if there had been duress. Therefore, Garita could have defeated the motion for summary judgment if it could have created a genuine issue as to duress,

such as by providing competent evidence showing that it had entered into a prior oral agreement with Ponce Federal pursuant to which Garita was not required to obtain a casino license prior to the issuance of the loan. However, as discussed below, the Court finds that no oral contract was entered into, and especially not one containing the terms claimed by Garita.

**B. Existence of a Prior Oral Agreement**

**1. Applicability of the Commerce Code**

■ Pursuant to Article 2 of the Commerce Code of Puerto Rico, "[c]ommercial transactions, be they consummated by merchants or not, whether they are specified in this Code or not[,] shall be governed by the provisions contained in the same. . . . Commercial transactions shall be considered those enumerated in this Code *and any others of a similar character*." P.R.Laws Ann. tit. 10, § 1002 (Official translation 1976; emphasis added). More specifically, under Art. 229 of the Commerce Code "[a] *loan* shall be considered commercial when the following conditions are present: (1) That one of the contracting parties is a merchant;" *and* "(2) When the articles loaned are destined to commercial transactions." P.R.Laws Ann. tit. 10, § 1651 (Official translation 1976; emphasis added). Both conditions must be present for the Commerce Code to be applicable to a loan contract. *Pescadería Rosas, Inc. v. Lozada*, 116 P.R.Dec. 474, 477 (1985) (Trías Monge, C.J.).

■ The Court concludes that the alleged oral loan agreement was commercial. First, banks are merchants for purposes of the Commerce Code. Commerce Code Art. 1, codified at P.R.Laws Ann. tit. 10, § 1001 (Official translation 1976). Second, the alleged oral loan agreement was destined for commercial transactions. There are two alternate grounds for this particular conclusion.

■ There is some authority supporting the view that any loan to which a bank is a party should be considered a commercial loan. Relying on Art. 2, cited above, the Supreme Court of Spain has held that it is not necessary to show that "the articles

loaned are destined to commercial transactions" when the loan in question is issued by a bank, "even if the loan is issued to a person who is not a merchant, who does not propose to employ the money in commercial operations." Judgment of May 9, 1944 (Sp.) (Translation ours). Presumably, the Court considered bank loans to be commercial not because they fall within Art. 229, but rather because they are transactions of a character similar to the transactions enumerated in the Commerce Code. According to one commentator,

> From this system of [Art. 229's], one could arrive at the *absurd* conclusion that those loans issued by banks ... are not commercial when they are issued to persons who do not propose to use the object of the loan for commercial transactions, a situation that would occur rather frequently. Our Supreme Court, in its Judgment of May 9, 1944, confronting this criticism, has declared that [Art. 229's] intentionalist criterion (that the loaned objects be used for commercial transactions) does not bar the possibility that as long as the contracts of this kind are characterized as bank loans, they could be considered to be commercial, *under the aegis of Art. 2* ... even if the loan were issued to non-merchants who do not propose to use the money for commercial transactions.

Joaquín Garrigues, *Curso de Derecho Mercantil [Course on Commercial Law]*, Tome IV, p. 145 (TEMIS: 7th ed. 1987) (Translation ours; emphasis added). *See also* José M. Martínez–Val, *Derecho Mercantil [Commercial Law]*, 496–98 (Bosch 1979) (loans made by banks are commercial loans and are therefore governed by the Commerce Code). The Spanish Court's interpretation brings a welcome uniformity to this area of the law. ■ However, the position taken by the Spanish Supreme Court is not yet the law in

Puerto Rico. *Pescadería Rosas,* 116 P.R.Dec. at 481 n. 8 ("Regarding bank loans, which have generated great controversy, we are not expressing [ourselves] at this time.") (Translation ours). In fact, the only other decision by the Supreme Court of Puerto Rico that is roughly on point concludes that all bank loans are not necessarily commercial. *Banco de P.R. v. Rodríguez,* 53 P.R.Dec. 174 (1938). Although the doctrinal influence of the Spanish Supreme Court, as well as the practical virtues attending its interpretation of Art. 229 may very well carry the day in some future decision by the Supreme Court of Puerto Rico, this Court is not so certain of that outcome so as to reach a decision on that basis. Had the Spanish Supreme Court's rule been the only basis for holding that the alleged oral loan agreement was commercial, the Court would have given serious consideration to certifying this issue to the Supreme Court of Puerto Rico.[15]

Fortunately, there is another, firmer ground for concluding that the alleged oral loan agreement was, or would have been, commercial; namely, that the monies to be loaned were destined for commercial transactions. Art. 2, in defining commercial transactions, refers both to transactions regulated exclusively by the Commerce Code as well as to those that are regulated simultaneously by the Commerce and Civil codes, such as loans and sales. Although there is no formula for determining which transactions are commercial, the one element these transactions have in common is "their purpose, their connection with commercial exchange, their habituality, their attention to the mutable value of things." *Pescadería Rosas,* 116 P.R.Dec. at 479.

On this basis, courts have considered commercial "the business of developing or building for others who, in turn, sold or leased housing units to the public." *F.D.I.C. v.*

---

**15.** The standard for certifying questions of state law is well-established. "Absent controlling state court precedent, a federal court ... may certify a state law issue to the state's highest court, or undertake its prediction 'when the course [the] state courts would take is reasonably clear.' " *VanHaaren v. State Farm Mutual Automobile Insurance Co.,* 989 F.2d 1, 3 (1st Cir.1993) (citing *Porter v. Nutter,* 913 F.2d 37, 41 n. 4 (1st Cir.

1990)). *See Lareau v. Page,* 39 F.3d 384, 390 (1st Cir.1994) (citing *VanHaaren,* 989 F.2d at 3); *Lyons v. National Car Rental Systems, Inc.,* 30 F.3d 240, 245 (1st Cir.1994) (same)).

That the Puerto Rico Supreme Court explicitly left open the question whether or not bank loan contracts are, by definition, commercial suggests that the course the Supreme Court would take is *not* reasonably clear.

*Consolidated Mortgage and Finance Corporation*, 805 F.2d 14, 18 (1st Cir.1986). It has been noted that it is clear that those involved in the areas of promotion and construction of structures, houses, and buildings in the context of the construction industry have to be considered subject to the regulation of the Commerce Code. *F.D.I.C. v. Barrera*, 595 F.Supp. 894, 899 (D.P.R.1984) (Torruella, C.J.). Another way of putting the question is whether a party was serving as an intermediary in chains of acts and transactions whose objective was, basically, to satisfy human housing, food, and recreation needs. *F.D.I.C. v. Barrera*, 595 F.Supp. at 899 n. 2.

Garita sought to borrow $14 million in order to rebuild and refurbish a hotel, restaurant, and casino complex whose gross income was projected to surpass $16 million per year. Although Garita did not intend to resell the hotel complex, it did intend to sell its services to the public, who would have rented rooms at the hotel, purchased food at the restaurants, and soon parted with their money at the casino. As such, Garita would have served as an intermediary in chains of acts and transactions whose objective was, basically, to satisfy human housing, food, and recreation needs. *F.D.I.C. v. Barrera*, 595 F.Supp. at 899 n. 2. Furthermore, Garita is a wholly-owned subsidiary of a corporation which is engaged in the business of owning and operating hotels and casinos across the United States. In sum, the Court concludes that the loan sought by Garita was to be used for commercial purposes, and therefore, that the Commerce Code is applicable to the alleged oral loan agreement.

As noted before, the applicability of the Commerce Code to the oral agreement controls the result in this case. Pursuant to Commerce Code Art. 82, the testimony of witnesses shall not in itself be sufficient to prove the existence of a [commercial] contract the amount of which exceeds three hundred dollars, unless such testimony concurs with other evidence. P.R.Laws Ann. tit. 10, § 1302. Therefore, in order to establish the existence of the alleged oral loan agreement, Garita was required to submit non-testimonial evidence. *See* discussion *supra* part V.

As discussed below, the Court finds that the necessary evidence is lacking.

## 2. Nature of the Evidence Available

On April 13, 1995, Mr. George Malizia was deposed by the parties. He testified that, as one of Garita's representatives during the negotiations with Ponce Federal, he was told in September, 1986, by members of the Ponce Federal Board of Directors that "the loan was approved." As corroborating, nontestimonial evidence, Garita submits the minutes taken at the meetings of the Board of Directors and the Executive Committee. The minutes taken at the meeting of Ponce Federal's Board of Directors on September 16, 1986, indicate that the Board had expressed interest in the loan application but had unanimously decided to delegate the decision to the Executive Committee. The minutes taken at the Executive Committee's meeting on September 18, 1986, show that Ponce Federal evaluated the loan in the light of the feasibility study prepared by Laventhol & Horwath that had been appended by Garita to the loan application, and also expressly stated that Ponce Federal "took into consideration the fact that a casino license would be required." Garita claims that Mr. Malizia's deposition, together with the minutes, establish the existence of an oral agreement between Garita and Ponce Federal for loan of $14 million, without the requirement that Garita obtain a casino license.

Unfortunately, Garita's argument fails upon closer examination of the evidence. According to the feasibility study submitted by Garita and considered by the Executive Committee, for example, the hotel would derive almost 30% of its gross income from the casino operations. Furthermore, the Committee evidently was under the impression that condition 7(h) of the GDB commitment letter required Garita to obtain a casino license.

Even making all reasonable inferences in favor of Garita, the other documentary evidence fails to corroborate Garita's claim that Ponce Federal committed itself to issuing a loan without requiring a casino license. The evidence not only fails to support Garita's claim; in fact, what evidence there is points

in the opposite direction. For example, in July, 1986, Garita wrote to the Commissioner of Financial Institutions, stating that its financial backers required a casino license prior to closing the loan agreement. A similar inference may be drawn from the letter Garita sent on November 21, 1986, to GDB stating that since June, 1986 (two months prior to the alleged oral agreement), Ponce Federal had taken the position that the GDB's commitment letter required Garita to obtain a casino license. Finally, GDB responded to Garita's letter by explaining that it interpreted the commitment letter to require Garita to furnish acceptable evidence of a valid casino license prior to the disbursement of the loan.

The Court is aware that the Court of Appeals did not "think the language of condition 7(h) must *inevitably* be read in that restrictive fashion." *Garita Hotel*, 958 F.2d at 19 n. 5 (Emphasis added). However, the Court of Appeals' comments were made in the context of deciding whether or not Garita had stated a cause of action upon which relief could be granted, not whether summary judgment should be granted. Here, Garita may not merely allege that it thought that condition 7(h) did not require a license. Because a valid contract requires the consent of the parties, Garita had to furnish non-testimonial evidence that GDB and/or Ponce Federal interpreted the commitment letter *not* to require a casino license. However, from the evidence described above, one cannot reasonably make such an inference.

In light of the non-testimonial evidence described above, and pursuant to the means prescribed by Commerce Code Art. 82, the Court finds that Garita has failed to create a genuine issue of fact as to the existence of a prior oral loan agreement that did not require a casino license as a condition precedent to the disbursement of the loan.

## VI. Conclusion

Because no prior oral agreement was proven to exist, Ponce Federal's refusal to issue a loan without Garita first obtaining a casino license cannot constitute intimidation. Because there was no intimidation, the written Loan Agreement requiring a casino license was valid and enforceable. Because Garita failed to obtain a casino license, Ponce Federal did not breach any contractual obligations by refusing to issue a loan in favor of Garita. The motion for reconsideration is granted, and summary judgment will be entered accordingly dismissing the instant complaint with prejudice.

IT IS SO ORDERED.